Filed 3/23/22  In re S.G. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.G. et al., Persons Coming Under the Juvenile Court Law. | B313759 (Los Angeles County Super. Ct. No. 18CCJP03003) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> E.G., <br><br> Defendant and Appellant. | |

APPEAL from an order terminating parental rights of the Superior Court of Los Angeles County, Stephen C. Marpet, Judge Pro Tempore.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

Father, E.G., challenges the juvenile court's order terminating his parental rights over his children S.G. and L.G. Father argues social workers failed to comply with state law (Welf. & Inst. Code, § 224.2) implementing the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; (ICWA)). Specifically, father argues, and respondent agrees that the child welfare agency failed to interview mother's and his extended family members about Indian ancestry. The issue before us is whether that error was prejudicial. We conclude it was not. The record belies father's speculation that extended family members would have had meaningful information about Indian ancestry.

Father also argues we should remand the case so the juvenile court can consider the parental-benefit exception to adoption, an exception father failed to raise in the juvenile court. Father has thus forfeited this challenge. Even considering the challenge on its merits, father fails to demonstrate under the analysis in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) that the exception describes his relationship with S.G. and L.G. We affirm.

2

## BACKGROUND

Mother and father have a long history in the dependency system, with mother herself being the subject of a referral when maternal grandmother punched her and slapped her with a shoe.[1]  Father's history dates back to 1999 with reports that father threatened a former partner causing her to fear for her life and her child's life.

In 2015, the juvenile court sustained an allegation that father strangled and struck mother, and that father has a history of criminal convictions including infliction of corporal injury on a spouse or cohabitant.  The 2015 case also involved sustained allegations that mother engaged in an altercation with maternal grandmother in S.G.'s presence and that mother has a history of substance abuse rendering her incapable of providing regular care and supervision of S.G.  The case terminated in 2017 with a custody order granting father physical custody of S.G. and monitored visitation to mother.  The current case commenced in May 2018.  On May 11, 2018, the juvenile court detained S.G., removing him from father's custody and ordered monitored visitation.  We summarize only those facts relevant to this appeal.

### 1.    *Jurisdiction*

After the Los Angeles County Department of Children and Family Services (DCFS) filed several petitions, in September 2018, the juvenile court assumed jurisdiction over S.G. (born in April 2014).  After L.G.'s birth (July 2018), DCFS

---

[1] Mother and father were in a long-term relationship but were not married.  Father has five children with other partners. Mother is not a party to this appeal.

filed a petition identifying her as a dependent child. With respect to both children, the juvenile court sustained allegations that mother and father have a history of engaging in physical altercations in the presence of S.G. The juvenile court observed: "The most recent case closed 10/19/17 with the child [S.G.] being released to the father and mother having monitored visits, father not to monitor her visits & the visits not to be in the family home. The parents violated these orders and conflicts continued in the presence of the minor."

On July 25, 2019, DCFS filed a subsequent petition, and in October 2019, the juvenile court sustained the allegation that mother had an unresolved drug abuse problem, which rendered mother incapable of caring for the children. The court also sustained both the allegation that mother allowed father to have unlimited access to the children when she knew father's visits were supposed to be monitored and the allegation that father struck mother's face in the presence of the children.

## 2. *Father's conduct during the dependency proceedings*

In September 2018, social workers worried that father was unable to control his temper because he was "quick" to anger. Paternal grandfather was no longer willing to monitor father's visits with the children. Mother also reported S.G. observed 10 incidents of domestic violence between mother and father. Father was aggressive toward social workers too.

Social workers interviewed S.G. in September 2018, and S.G. reported he saw his parents fight three times. Around the same time, social workers interviewed mother, who described father as aggressive. Mother said that S.G. "became accustomed to the fights and would watch his you-tube as they [the parents] would fight in the background." Paternal grandfather described

4

father as having "a history of engaging in violent altercations." Paternal stepgrandmother described father as violent in his relationship with the mothers of his other children.

Father admitted smoking marijuana, and at the beginning of the dependency proceedings, regularly tested positive for marijuana. Commencing, however, in August 2018, father tested negative for 14 consecutive weeks. As a result of father's consecutive negative tests, the juvenile court no longer required him to test for controlled substances.

Father completed a parenting class and enrolled in a domestic violence class and individual counseling. In November 2018, the juvenile court described father as "doing well in his programs."

In February 2019, father withdrew from individual therapy against the recommendation of his therapist. Father reported he discontinued therapy because it was a "set-up." Father states in his appellate brief he felt set up because the therapist reported that father wanted to hurt the supervising social worker. In March 2019, DCFS reported that father continued to attend a domestic violence program and individual counseling.

In March 2019, a social worker applied for a temporary restraining order protecting him from father. The basis for the restraining order was that father "wanted to physical[ly] hurt" the social worker. The juvenile court granted the temporary order and later issued a permanent restraining order protecting the social worker.

Also in March 2019, DCFS reported that father's aggressive behavior continued notwithstanding his participation in court-ordered programs. In addition to threatening the social worker,

father cursed in front of S.G. because father was upset with paternal grandfather.

On June 6, 2019, the juvenile court granted mother's request for a restraining order protecting mother and the children from father. The restraining order prevented father from being within 100 yards of the children (then five years old and one year old) except during father's supervised visits.[2]

In July 2019, S.G. reported that mother and father frequently fought. He also recounted that father yelled and cursed at maternal grandmother and maternal grandfather when they told him to leave their home.

### 3. *Father's visits with the children*

In September 2018, DCFS reported father regularly visited both children; father's visits were monitored. In November 2018, DCFS reported father visited consistently. DCFS also stated that after S.G. visited with father, S.G. demonstrated anxieties and aggressive tendencies, including calling a classmate a "fucking bitch." S.G. exhibited anxieties by licking his lips until they developed a rash, tugging on clothes, and laughing uncontrollably. Also in November 2018, the person responsible for monitoring father's visits reported the visits went well and S.G. did not want them to end. The monitor represented that father loves S.G.

In January 2019, DCFS stated father consistently visited both children, and that S.G. appeared comfortable in father's presence. In January 2019, DCFS permitted father unmonitored

---

[2] In his opening brief on appeal, father relies on a reporter's transcript not included in the record on appeal to describe the restraining order.

visits. As a condition of his unmonitored visitation, father agreed that unless someone had a valid driver's license, that person (including father) could not transport S.G. S.G.'s caregivers continued to observe S.G. to be more aggressive after father's visits. Paternal stepgrandmother observed father drive S.G. Maternal grandmother observed father drive L.G. It is uncontroverted that father did not have a valid driver's license on these occasions.

In March 2019, DCFS reported father consistently visited the children at least two times a week. That same month, however, DCFS filed a section 388[3] petition to change father's visits back to monitored and a section 385[4] petition also requesting the juvenile court allow only monitored visits. DCFS supported the section 388 petition with a report describing S.G.'s caregivers' statements that S.G. displayed anxiety and aggressive tendencies after visiting father. For example, S.G. tried to throw a chair at paternal grandfather. During a therapy session, S.G. revealed that he wanted "to kill someone."

On April 5, 2019, the juvenile court ordered father's visits monitored. Father's visits remained monitored for the duration of the dependency proceedings.

---

[3] Section 388 in relevant part allows a person with an interest in a dependent child to petition the court to "change, modify, or set aside any order of court previously made." (§ 388, subd. (a)(1).)

[4] Section 385 provides: "Any order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper, subject to such procedural requirements as are imposed by this article."

7

In April 2019, DCFS reported "[a]lthough the father has completed a parenting class and he has been observed to be appropriate during his visits with his children, he is unable to take ownership of his actions and to understand that his behaviors can have a negative effect on the children." Father forcibly took S.G. for an unmonitored visit, causing paternal stepgrandmother to call law enforcement. Father indicated he knew his visits were supposed to be monitored but he "just wanted to see" S.G.

In April 2019, DCFS represented father drove with L.G. even though he did not have a driver's license. L.G.'s caregiver reported father's visits were " '[c]haotic.' " L.G.'s caregiver reported that when father "does not get what he wants, he makes everybody's life miserable."

In May 2019, DCFS reported that father acted appropriately during his monitored visits and visited the children two times a week. In a last minute information for the court, however, a social worker described an incident occurring on May 14, 2019 during a monitored visit at which a social worker told father not to discuss case issues with the children and father responded, "[T]his is bullshit," in the presence of the children.

In July 2019, S.G. told a social worker when father "gets stressed out, he fights with everyone." S.G. said, "My dad wanted to beat up my Tata, so I want to beat up my dad because he wanted to beat up my Tata, but I am too little." The record does not further identify Tata. DCFS reported mother did not want father to visit the children because father was violent. Also in July 2019, a social worker described father and L.G. as having a "strong bond" based on the fact that father was able to console

8

L.G. when she cried.  The social worker described L.G. as "feel[ing] very comfortable in father's presence."

In September 2019, father continued to visit twice a week.  His visits were still monitored.  Someone, although the record does not identify that person, reported father "has become verbally loud and aggressive by cussing in the presence of the children [S.G.] and [L.G.]  The children are reported to be appropriately bonded to father . . . and have been observed to be happy and comforted while in his care."

On October 3, 2019, DCFS staff ended one of father's monitored visits because he barricaded the lobby at the DCFS office where father was visiting the children, refused to clean up after himself, and refused to sign the form required for supervised visits.

In February 2020, DCFS again reported that father consistently visited the children.  According to DCFS, at that time, the children appeared comfortable with father.  Father arrived promptly and "seems to enjoy his children."  The children also "seem to enjoy visiting with the father. . . ."  Paternal aunt, however, reported that after visits with father, S.G. misbehaved in school.

Beginning March 15, 2020, father could no longer visit in person because of the COVID-19 pandemic.  As of July 2020, S.G. stated he did not want to have any phone calls or visits with father.  In July 2020, S.G. reported that father hit mother with his fist on her arm.

In December 2020, DCFS's status review report stated that there is a restraining order protecting the children from father.  The restraining order allowed father monitored visits twice a week at a DCFS office or therapeutic setting.  The social worker

told father the restraining order prohibited phone calls and physical contact.[5]  "[F]ather has asked several times when the [DCFS] office will be open in order for him to continue receiving visits . . . ."  Since December 2020, father has had no visits.

### 4.    *The children's placements*

S.G. initially lived with paternal grandfather and paternal stepgrandmother.  S.G. did well in school except he was aggressive.  Social workers described S.G. as having a strong bond with paternal grandfather and paternal stepgrandmother. Initially, L.G. was placed with paternal aunt.

On May 16, 2019, the juvenile court placed S.G. and L.G. in mother's care.  At that time, L.G. was nine months old.  S.G. was five years old.

Subsequently, the juvenile court sustained allegations that mother had a positive toxicology test for methamphetamine and amphetamine on July 8, 2019 while the children were in her care. As noted above, the juvenile court also sustained a supplemental petition alleging that mother allowed father to have unlimited access to the children, and on July 5, 2019, father struck mother's face in the presence of the children.

In July 2019, the juvenile court ordered the children removed from mother's custody and DCFS reported that the

---

[5]  At a hearing October 25, 2019, father's attorney requested that the restraining order be modified to exclude the children.  The court responded, "We can have the restraining order modified to exclude the children."  On February 21, 2020, at another hearing, father's counsel again requested that the children be removed from the restraining order.  In contrast to its earlier statement, the juvenile court stated, "[T]hat will remain."

10

children lived with paternal aunt, where L.G. previously had been living. Paternal aunt reported that the siblings were bonded even though S.G. sometimes was jealous of L.G. Paternal aunt supported, cared for, and loved the children. Paternal aunt was poised to adopt the children, but a social worker removed the children from her care after paternal aunt allowed father to have unmonitored visits with the children.

On July 9, 2020, DCFS reported the children reside in the care of Mrs. H., maternal great aunt, who wanted to adopt the children. Mrs. H. loved the children. Social workers described the children as "thriving" in Mrs. H.'s home.

Mrs. H. passed away on December 5, 2020 from COVID-19. DCFS subsequently reported the children reside with Mr. and Mrs. S. S.G.'s therapist reported that S.G.'s behavior improved following his placement with Mr. and Mrs. S. Mrs. S. recognized that S.G. had been in many placements, and she reassured him she and her husband loved him and would continue to provide for him. A social worker described S.G. as calmer and happier after his placement with Mr. and Mrs. S. S.G. indicated he always wanted to live with Mr. and Mrs. S. L.G. and S.G. developed a closer bond when they lived with the S. family, and were affectionate with Mr. and Mrs. S. The children appreciated that Mr. and Mrs. S. would play with them and put them to bed as well as take them for outings. Mr. and Mrs. S. wanted to adopt S.G. and L.G.

In June 2021, a social worker reported: "CSW has seen the improvement in both children especially in child [S.G.'s] behavior. The child seems more calm and able to concentrate on specific tasks. . . . Mr. and Mrs. S. have taken the children on multiple trips which are usually outdoors [*sic*] activities and that

11

[the] children seem to really enjoy those trips.  Mr. and Mrs. S. have been instrumental to the positive change that the children, especially the child [S.G.] has made."

5.  ***Section 366.26 permanency planning hearing and order***

Father did not appear at the section 366.26 hearing.  His counsel argued, "Father would request that his parental rights not be terminated.  And if the court is inclined to do so it would be over his objection."  The court stated, "It's clear that the parents are not visiting and having sufficient contact.  Father, I believe there was a restraining order which made it difficult."

The juvenile court found the children adoptable.  The juvenile court found that father had not maintained regular visitation and that any benefit accruing to the children from maintaining a relationship with father was outweighed by the benefit the children would receive from adoption.  The court terminated father's parental rights.  Father timely appealed from the order terminating those rights.

## DISCUSSION

### A.  Father Does Not Demonstrate Prejudicial Error Concerning the Investigation of the Children's Indian Ancestry

Father argues we must reverse the order terminating parental rights because DCFS failed to interview extended family members about potential Indian ancestry and the parents failed to fill out the Judicial Council ICWA-020 form as updated in January 2020.  Father contends he was prejudiced because (1) father's and mother's answers on the 2020 ICWA forms "were

12

likely to bear meaningfully on the determination at issue about the children's Indian status," and (2) relatives could have provided information that "would have likely shed meaningful light on whether there is reason to believe the children were Indian children."

### 1. Additional background

The record reflects that in a 2015 case involving S.G., the juvenile court concluded it had no reason to know S.G. was an Indian child. On May 9, 2018, a social worker completed a Judicial Council form indicating that S.G. had no known Indian ancestry. The form does not identify the source of this information.

On April 11, 2018, mother denied any Indian ancestry. On April 12, 2018, father denied any Indian ancestry. On May 11, 2018, father and mother filed ICWA-020 forms (as updated on January 1, 2008), checking the box "I have no Indian ancestry as far as I know." At that time, mother resided with maternal grandmother, maternal grandfather, and maternal great grandmother. Father resided with paternal great grandmother. Father had contact with paternal grandmother, who monitored his visits, paternal grandfather, who cared for S.G. at the beginning of the dependency period, and paternal aunt, who cared for L.G. at the beginning of the dependency proceedings.

The juvenile court's May 11, 2018 order concerning S.G. states: "The Court does not have a reason to know that this is an Indian Child, as defined under ICWA, and does not order notice to any tribe or the BIA [Bureau of Indian Affairs]. Parents are to keep [DCFS], their Attorney and the Court aware of any new information relating to possible ICWA status." No one informed the court of any additional information.

On July 23, 2018, a social worker completed an Indian child inquiry with respect to L.G. The social worker filed a Judicial Council form (ICWA-010(A) as revised January 1, 2008), indicating that L.G. has no known Indian ancestry. The form does not identify the source of this information. A social worker, however, interviewed mother on July 19, 2018, and mother reported L.G. was not an Indian child.

With respect to L.G., the juvenile court's minute order dated July 25, 2018 provides: "The Court does not have a reason to know that this is an Indian Child, as defined under ICWA, and does not order notice to any tribe or the BIA. Parents are to keep [DCFS], their Attorney and the Court aware of any new information relating to possible ICWA status." The minute order indicated both parents completed ICWA 020 forms on July 25, 2018; those forms are not in the record.

### 2. Analysis

"At the outset of a dependency case, the child welfare agency and the juvenile court have a statutory initial duty to inquire into whether a child is, or may be, an Indian child. 'The child welfare department's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." [Citation.]' [Citation.]"[6] (*In re*

---

[6] Effective September 18, 2020, section 224.2, subdivision (b) provides: "If a child is placed into the temporary custody of a county welfare department pursuant to Section 306 or county probation department pursuant to Section 307, the county

14

*Darian R.* (Feb. 24, 2022, B314783) ___ Cal.App.5th ___, ___ [2022 Cal.App.Lexis 155 at pp. *7–*8] (*Darian R.*), italics omitted.) The parties do not dispute that social workers did not interview his or mother's extended family members. It is undisputed that the failure to interview extended family members was error. The critical issue is whether that error prejudiced father.

We conclude the error was not prejudicial. Both parties rely on *In re Benjamin M.* (2021) 70 Cal.App.5th 735 (*Benjamin M.*) for the definition of prejudice when DCFS has failed to interview extended family members about Indian ancestry, that is, "where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M.*, at p. 744.) The *Benjamin M.* court concluded the failure to inquire of extended family members there was prejudicial because the father of one of the children at issue never appeared in the proceeding and that father's brother was available to ask instead about Indian ancestry. *Benjamin M.* reasoned, "Father's brother's knowledge of his own Indian status would be suggestive of Father's status. While we cannot know how Father's brother would answer the inquiry, his answer is likely to bear meaningfully on the determination at issue about

---

welfare department or county probation department has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."

15

his brother." (*Id*. at p. 745.) The failure to inquire was also prejudicial in *In re A.C.* (Mar. 4, 2022, B312391) ___ Cal.App.5th ___ [2022 Cal.App.Lexis 187 at p. *10]. There, extended family members were available, mother had been in foster care, a detention report referenced that the child may be an Indian child, and the only information about Indian ancestry before the juvenile court was the parents' Judicial Council ICWA forms.

On the other hand, sometimes the proposition that had DCFS inquired, it would have obtained meaningful information about Indian ancestry is mere speculation. Thus in *Darian R.*, we held where the parent challenging ICWA was under court order to provide information relevant to ICWA, there was no evidence the parent was estranged from her family, and a prior court order involving the same biologic parents found ICWA inapplicable, the record did not support the conclusion that readily obtainable information would bear meaningfully on whether mother's children were Indian children. (*Darian R.*, *supra*, ___ Cal.App.5th at p. ___ [2022 Cal.App.Lexis 155 at p. *13].) Similarly, DCFS's failure to interview a maternal grandmother was not prejudicial when the maternal grandmother was incentivized earlier in the proceedings to reveal Indian ancestry when she, with the support of mother's counsel, sought placement of the child in her care, yet revealed no such Indian ancestry.[7] (*In re S.S.* (Feb. 24, 2022, B314043) ___ Cal.App.5th ___, ___ [2022 Cal.App.Lexis 156 at pp. *9–*11].)

---

[7] We recognize there is a split of authority on the issue of prejudice. (See *In re Antonio R.* (Mar. 16, 2022, B314389) __ Cal.App.5th ___ [2022 Cal.App.Lexis 216 at pp. *17–*18] [disagreeing with *Darian R.* and *In re S.S.*].)

The case before us is similar to *Darian R.*  In a prior proceeding, the juvenile court found that there was no reason to know S.G. was an Indian child.  S.G. and L.G. had the same parents and therefore the same ancestors.  In the current proceeding, each parent denied having Indian ancestry in multiple interviews with social workers and in filling out ICWA 020 forms.  Since 2018, father and mother, who lived with their extended family and had contact with other extended family members, were under court order to inform their counsel and the juvenile court of any information suggesting that the children may have Indian ancestry.  Neither mother nor father provided any information suggesting their representations that the children had no Indian ancestry were incorrect.  Father's argument on appeal that asking extended family members about Indian ancestry would have yielded meaningful information is thus mere speculation and does not support a conclusion of prejudice.

Finally, father's argument that the failure to request mother and him to update their ICWA 020 Judicial Council forms prejudiced him is not well-founded.  DCFS asked both parents on multiple occasions about Indian ancestry and the juvenile court ordered them to inform their counsel and the court about any new information about Indian ancestry.  None was forthcoming during the lengthy dependency proceedings.  Under these circumstances, father's argument again is speculation.

## B.  The Parental-benefit Exception to Adoption Does Not Apply

Father claims on appeal that the trial court erred in terminating his parental rights because his relationship with S.G. and L.G. fits within the parental-benefit exception.

17

Specifically, he asserts that the juvenile court improperly focused on his lack of visitation during the COVID-19 pandemic. We conclude father has failed to demonstrate any such error.

First, father never raised the parental-benefit exception in the juvenile court. Accordingly, as respondent argues, he has forfeited this challenge on appeal. (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 292.) Second, father's challenge on appeal based on the parental-benefit exception fails on its merits.

At a permanency planning hearing, if the child is not an Indian child, the juvenile court may order adoption, guardianship, long-term foster care, or order the child be permanently placed with a "fit and willing" relative. (§ 366.26, subds. (b), (c).) The preferred permanent plan for a child in the dependency system is adoption. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1149.) A parent may demonstrate an exception to adoption if the parent establishes the parental-benefit exception (*id.* at p. 1150), with the burden on the parent to demonstrate the exception applies (see *In re C.B.* (2010) 190 Cal.App.4th 102, 122).

*Caden C.*, *supra*, 11 Cal.5th 614 announced a tripartite analysis for applying the parental-benefit exception: "The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-

18

benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Id.* at pp. 636–637.) *Caden C.* further counseled that the trial court must consider "would the child benefit from continuing the relationship [with the parent] and be harmed, on balance, by losing it?" (*Id.* at p. 638.) Finally, the high court observed the parental-benefit exception to adoption applies only in exceptional circumstances. (*Id.* at p. 631.)

Father's argument focuses only on the first element of the *Caden C.* analysis—consistency of visitation. We acknowledge there was evidence that father visited consistently when permitted by the court, and then some when he visited without the court-ordered monitor in violation of the juvenile court's order. In the last year of the dependency proceedings, however, the COVID-19 pandemic prevented visitation. Assuming arguendo that this evidence would favor father as to the first element of the *Caden C.* analysis, it does not, by itself, support the other two elements of the parental-benefit exception in the *Caden C.* analysis.

With respect to the continuing benefit element, *Caden C.* explained: "[T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

Here, S.G., who had lived a portion of his young life with father, wanted no contact with father by the time the juvenile

19

court was considering terminating parental rights, and when S.G. had contact with father, he exhibited anxious and aggressive behavior. S.G.'s behavior improved markedly after his visits with father terminated. L.G. never lived with father and saw him only during limited visits, most of which were monitored. There was *no* evidence that she had a positive attachment with father or that she missed the visits when they stopped. Although there was evidence that father comforted L.G. during his monitored visits and that she felt comfortable with him, that evidence does not support the conclusion that she had a strong attachment to father. The record does not support the conclusion that father nurtured the children or provided them with a sense of security. Father did not testify at the hearing terminating his parental rights, and on appeal marshals no evidence suggesting that he had a positive relationship or attachment with either child at the time of the hearing terminating his parental rights.

Father also offered *no* evidence supporting the conclusion that terminating the children's attachment with him would be detrimental to the children. Father identifies no harm from the children's loss of their relationship with him. Father offers no theory under which we could conclude that the children's loss of their relationship with father would outweigh the benefit of placement in a new adoptive home, here with the S.'s where the children had stability and the opportunity to bond with each other. Therefore, assuming arguendo that father maximized visitation as permitted by the juvenile court, father fails to demonstrate the parental-benefit exception would preclude adoption. In sum, he fails to demonstrate the juvenile court erred in terminating his parental rights.

## DISPOSITION

The order terminating father's parental rights is affirmed.
<u>NOT TO BE PUBLISHED.</u>

BENDIX, J.

I concur:

ROTHSCHILD, P. J.

CRANDALL, J.,* Concurring and Dissenting.

While fully joining in the court's majority opinion with respect to the parental-benefit exception analysis, I would conclude that the Los Angeles County Department of Children and Family Services' (Department) admitted failure to interview extended family members under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) was harmless as described in my dissent in *In re A.C.* (Mar. 4, 2022, B312391) ___ Cal.App.5th ___ [2022 WL 630860].  To wit, father E.G. has not demonstrated that, had the Department inquired of extended family members, they would have provided a reason to believe the children were Indian children.

CRANDALL, J.*

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.